OPINION OF THE COURT
Lee L. Holzman, J.
In this accounting proceeding, the objectant, the Department of Social Services of the City of New York, has moved for summary judgment granting its claim in the sum of $34,913.44 for Medicaid benefits that it paid on behalf of the decedent to Montefiore Hospital. The parties stipulated that the papers filed by the executrix in opposition to the summary judgment motion would be deemed a cross motion for summary judgment.
The underlying issue, a question of first impression, is whether the decedent or the hospital should pay for the hospital care during the period that the decedent would have been discharged from the hospital if either he had accepted the hospital’s discharge plan or the hospital had not delayed his discharge by instituting a proceeding, which was ultimately denied, to appoint a conservator for him. In the absence of any express statutory authority, the court holds that the facts presented are analogous to those cases in which the court denies or dismisses the petition for the appointment of a guardian under article 81 of the Mental Hygiene Law, and, consequently, the hospital costs at issue may be charged to the hospital or to the patient “or * * * both in such proportions as the court may deem just” (see, Mental Hygiene Law § 81.09 [i]; § 81.10 [f]).
The decedent entered Montefiore Hospital for hip replacement surgery on October 19, 1984 and was not discharged until May 13, 1985. The hospital petitioned pursuant to article 77 of the Mental Hygiene Law for the appointment of a conservator, alleging that the decedent had a “substantial impairment of his ability to care for his property and to provide for himself’ as a result of “advanced age and illness.” The petition was supported by an affidavit of a social worker sworn to on March 7, 1985 in which she stated the following: the decedent states that he has hundreds of thousands of dollars at Chase Manhattan Bank, a claim which has not been verified but “his reported wealth has not been refuted by other information gleaned about him;” that he is presently stable for discharge but refuses to go along with the discharge plan of either a nursing home placement or return to his home with care for 24 hours a day because of his “reluctance to allow people in his home or to *151 part with the considerable sums it would cost to obtain these services;” and that the “case cries out for the appointment of a conservator to conserve his property and oversee a safe discharge plan.” The Honorable Irma Vidal Santaella denied the application in a decision rendered on December 2, 1985, stating that after “extensive and in-depth hearings,” she found that the decedent was “capable of managing his property and providing for himself and that he does not suffer any mental or physical impairment which impedes him from doing so.”
Although the objectant paid Medicaid benefits totaling $76,010.46 for the decedent’s entire stay in the hospital, it has filed a claim in the sum of only $34,913.14 because it is not seeking to be reimbursed for any benefits that it had provided more than 10 years prior to March 13, 1995, the date of the decedent’s death at 94 years of age (see, Social Services Law § 104 [1]). Notwithstanding that Montefiore Hospital knew that the decedent claimed to have a large sum of money deposited at Chase Manhattan Bank, it, nevertheless, apparently applied for Medicaid benefits on his behalf. The decedent died with an estate having a value in excess of $200,000. Thus, even though it appears that the decedent was not eligible for Medicaid benefits when the benefits were provided, it also appears that Montefiore and not the decedent was the party who was primarily responsible for applying for the benefits. Inasmuch as the objectant paid Montefiore for the Medicaid benefits, the objectant should stand in the shoes of Montefiore with regard to its right to recover from the decedent’s estate.
The objectant asserts that, regardless of whether the Medicaid benefits were correctly paid on behalf of the decedent, it is entitled as a preferred creditor to recover from his estate for the assistance that was provided to the decedent when he was 84 years of age (see, Social Services Law §§ 104, 369 [2] [b] [i] [B]). Furthermore, it contends that the provisions in the Mental Hygiene Law which previously authorized hospitals to institute a conservatorship proceeding for a patient (Mental Hygiene Law former § 77.03) and now grant the same authority to the hospital to institute a guardianship proceeding (Mental Hygiene Law § 81.06 [a] [7]) reflect a public policy in favor of paying the hospital for the services that it provides while the proceeding is pending. It also avers that it is significant that Public Health Law § 2803 (1) (g) (which it notes in its brief did not become effective until January 1, 1988, a date after which the benefits at issue were provided) provides that a hospital is prohibited from discharging a patient until the ser *152 vices needed by the patient are available. The objectant argues that this statutory provision also reflects a public policy that the hospital should not have to bear the cost of hospitalization for the period that the hospital is attempting to obtain the services needed for a safe discharge of the patient.
The principal contention of the executrix is that, regardless of whether the hospital acted in good faith, it would be unjust to require the decedent’s estate to pay the hospital bill for services rendered during the period that the hospital refused to discharge the decedent because it erroneously was of the opinion that he could not handle his own affairs. The executrix also avers that the objectant’s claim should be rejected on the grounds of laches because it waited for approximately a decade to assert its claim, by which time the decedent had died and could no longer assist in defending against the claim.
At the outset, the reliance of the executrix on the doctrine of laches is rejected both upon equitable considerations, the decedent possessed assets and knew that he had not paid for his hospitalization, and upon the controlling authority that the State may not be charged with laches in the absence of statutory authority (Matter of Jamestown Lodge 1681 Loyal Order of Moose v Catherwood, 31 AD2d 981). However, her contention that it would be unjust to require the estate to pay for these services merits more serious consideration.
Social Services Law § 104 (1) explicitly states that the right of the public welfare official to recover from the recipient for the benefits provided is based upon an “implied contract.” The law recognizes two types of implied contracts, those which are implied by the facts and those which are implied by the law. A contract implied from the facts is found where the consent of the parties to the agreement may be inferred from the acts of the parties and all of the surrounding circumstances (Tjoa v Butterfield Mem. Hosp., 205 AD2d 526). A contract that is implied by the law or a quasi-contract is not based upon express or implied consent and is really not a contractual remedy but, instead, is an equitable remedy erected to prevent unjust enrichment (Clark-Fitzpatrick, Inc. v Long Is. R. R. Co., 70 NY2d 382, 388-389). In light of the fact that section 104 of the Social Services Law does not provide that the public welfare official should try to obtain the agreement of the recipient to repay for the benefits under any circumstance, it is concluded that the “implied contract” referred to therein is the equitable remedy of a contract implied by the law rather than a contract implied from the facts. Thus, equitable considerations are relevant to the outcome of this proceeding.
*153 Circumstances can be envisioned where it would be equitable, even though the proceeding was ultimately dismissed on the merits, to hold that the patient should pay for the hospital expenses incurred while the conservatorship proceeding instituted by the hospital was still pending. One such case would be where a wealthy, competent patient, for eccentric reasons, desired to remain in the hospital even though the patient had the means to provide the care which would insure the safest discharge plan from the hospital. The opposite result would appear to be more equitable where either or both the hospital expenses incurred during the proceeding or the proposed discharge care plan would bankrupt the patient and the patient had rationally opted for a less expensive discharge plan than the plan proposed by the hospital. In such a case, the institution, notwithstanding that it might have acted in good faith, would be in a better position than the patient to bear the cost. Of course, the Legislature could decide that this cost should be paid from by public funds rather than by an individual or a single institution.
Here, all of the equities do not lie with either side. On one side of the ledger, requiring a person to pay for hospital services imposed upon him while he was being detained in the hospital because the hospital was erroneously of the opinion that he was not competent to make his own decisions is worthy of a nightmare recounted in a novel by Kafka. However, the following cannot be ignored in arriving at an equitable result: the decedent received Medicaid benefits in excess of $40,000 from December 1984 to March 1985 which he or his estate would have had to have repaid had he not lived for more than 10 years thereafter; all of the decedent’s funds were available to him during his lifetime while any portion of the claim that is now allowed is to be paid by his estate, the beneficiaries of which were not in any way dependent upon him; it appears that either the decedent or someone on his behalf would have had to have signed the Medicaid form that the hospital prepared which apparently failed to list all of his assets; and it also appears that, had the decedent been released from the hospital in March 1985, he would have expended significant funds for at least some home care assistance.
The court finds that the hospital expenses at issue herein are in many ways similar to the expenses of the court evaluator and counsel in an article 81 guardianship proceeding which, where the petition has been dismissed, may be imposed by the court against either the petitioner or the respondent in such *154 proportions as the court may deem just (Mental Hygiene Law § 81.09 [f]; § 81.10 [f]). Accordingly, based upon a consideration of all of the circumstances, the objectant’s motion for summary judgment is partially granted to the extent that judgment is awarded in its favor in the sum of $26,000 without interest. The cross motion of the executor is denied.